Slip Op. 14-31

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| **PAPIERFABRIK AUGUST KOEHLER AG**, | |
| Plaintiff, | |
| v. | |
| **UNITED STATES**, | **Before: Timothy C. Stanceu, Judge** |
| Defendant, | **Court No. 11-00147** |
| and | |
| **APPLETON PAPERS INC.**, | |
| Defendant-Intervenor. | |

## OPINION AND ORDER

[Remanding to the U.S. Department of Commerce the final results of an administrative review of an antidumping duty order on certain lightweight thermal paper from Germany]

Date:  March 25, 2014

*F. Amanda DeBusk*, *Matthew R. Nicely*, *Eric S. Parnes*, and *Robert L. LaFrankie*, Hughes, Hubbard & Reed, LLP, of Washington, DC, for plaintiff Papierfabrik August Koehler SE.

*Joshua E. Kurland*, Trial Attorney, Commercial Litigation Branch, U.S. Department of Justice, of Washington, DC, argued for defendant United States.  With him on the brief were *Stuart F. Delery*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades*, Assistant Director.  Of counsel on the brief was *Jessica M. Forton*, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce, of Washington, DC.

*Gilbert B. Kaplan*, King & Spalding LLP, of Washington, DC, argued for defendant-intervenor.  With him on the brief was *Daniel L. Schneiderman* and *Joseph W. Dorn*.

Stanceu, Judge: Plaintiff Papierfabrik August Koehler SE contests the final determination

("Final Results") issued by the International Trade Administration, U.S. Department of

Commerce ("Commerce" or the "Department") to conclude the first administrative review of an

antidumping duty order on certain lightweight thermal paper (the "subject merchandise") from

the Federal Republic of Germany ("Germany").  *See Lightweight Thermal Paper From*

*Germany: Notice of Final Results of the First Antidumping Duty Admin. Review*, 76 Fed.

Reg. 22,078, 22,079 (Apr. 20, 2011) ("*Final Results*").  The first administrative review period

covers entries of subject merchandise made from November 20, 2008 through October 31, 2009

("period of review" or "POR").  *Id.*

　　　Before the court is plaintiff's USCIT Rule 56.2 motion for judgment on the agency

record, Pls.' Rule 56.2 Mot. for J. on the Agency R. (Nov. 15, 2011), ECF No. 26

("Pls.' 56.2 Mot."), which both defendant United States and defendant-intervenor Appvion, Inc.

("Appvion")[1] oppose, Def.'s Mem. in Opp'n to Pls.' Rule 56.2 Mot. for J. upon the Agency R.

(Mar. 6, 2012), ECF No. 39 ("Def.'s Opp'n"); Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. on

the Agency R. (Mar. 7, 2012), ECF No. 42 ("Def.-intervenor's Opp'n").

　　　Plaintiff brings two claims.  First, plaintiff claims that the Department's decision in the

Final Results not to make downward adjustments in Koehler's home market sales prices to

account for certain rebates made on a monthly basis is not supported by substantial evidence and

is otherwise not in accordance with law.  First Am. Compl. ¶¶ 24-25 (May 20, 2013),

ECF No. 83 ("Am. Compl.").  Second, plaintiff claims that Commerce unlawfully denied

Koehler an opportunity to respond to certain correspondence between U.S. Senators and

Representatives and the Secretary of Commerce that was placed on the record on the last day of

the agency proceeding giving rise to this action.  *Id.* ¶¶ 22-23.

---

[1] On May 13, 2013, defendant-intervenor changed its name from Appleton Papers Inc. to
Appvion, Inc. ("Appvion").  *See Letter to Clerk of the Court Re: Papierfabrik AG v. United*
*States, Ct. No. 11-00147* (June 21, 2013), ECF No. 84.

Concluding that the contested determination was contrary to law, the court remands the

Final Results for further proceedings.

## I. Background

Plaintiff Papierfabrik August Koehler SE ("Koehler") is a German producer and exporter

of lightweight thermal paper.[2]  Compl. 1 (May 13, 2011), ECF No. 6.  Koehler and its U.S.

affiliate, Koehler America, Inc., participated as respondents in the first administrative review.[3]

*Lightweight Thermal Paper From Germany: Notice of Prelim. Results of Antidumping Duty*

*Admin. Review*, 75 Fed. Reg. 77,831, 77,831 (Dec. 14, 2010) ("*Prelim. Results*").

In the antidumping investigation, Commerce determined a 6.5% antidumping duty

margin for Koehler, the only producer/exporter investigated.  *Lightweight Thermal Paper from*

*Germany: Notice of Final Determination of Sales at Less Than Fair Value*, 73 Fed.

Reg. 57,326, 57,328 (Oct. 2, 2008).  Commerce issued an antidumping duty order on certain

lightweight thermal paper from Germany (the "Order") on November 24, 2008.[4]  *Antidumping*

*Duty Orders: Lightweight Thermal Paper from Germany & the People's Republic of China*,

73 Fed. Reg. 70,959, 70,959-60 (Nov. 24, 2008).  In response to requests by Koehler and

---

[2] During the course of the litigation, Papierfabrik August Koehler AG ("Koehler") changed from an "AG" to an "SE" corporate form.  First Am. Compl. 1 n.1 (May 20, 2013), ECF No. 83 ("Am. Compl.").

[3] Koehler America, Inc., previously a plaintiff in this action, was terminated as a party on May 20, 2013.  *See* Order (May 20, 2013), ECF No. 82.

[4] The antidumping duty order covers "certain lightweight thermal paper, which is thermal paper with a basis weight of 70 grams per square meter ($g/m^2$) (with a tolerance of ± 4.0 $g/m^2$) or less; irrespective of dimensions; with or without a base coat on one or both sides; with thermal active coating(s) on one or both sides that is a mixture of the dye and the developer that react and form an image when heat is applied; with or without a top coat; and without an adhesive backing."  *Lightweight Thermal Paper From Germany: Notice of Final Results of the First Antidumping Duty Admin. Review*, 76 Fed. Reg. 22,078, 22,079 (Apr. 20, 2011) ("*Final Results*") (footnotes omitted).

Appvion, the petitioner in the antidumping investigation, Commerce initiated the first

administrative review of the Order on December 23, 2009.  *Prelim. Results*, 75 Fed. Reg.

at 77,831.

    During the first administrative review, Koehler, the sole respondent in that review,[5]

reported having made rebates to customers in Germany, its home market, on monthly, quarterly,

and annual bases.  Koehler's Supplemental Sections A-C Questionnaire Resp. 15 (Apr. 15, 2010)

(Admin.R.Doc. No. 44).  In the preliminary results of the review ("Preliminary Results"),

Commerce, in determining the normal value of Koehler's subject merchandise according to

Koehler's sales of the foreign like product in Germany, made adjustments to the home market

sales prices for all of the reported rebates and preliminarily assigned Koehler a *de minimis*

antidumping duty margin.  *Prelim. Results*, 75 Fed. Reg. at 77,835-87.

    In response to the Preliminary Results, Appvion submitted a case brief that, *inter alia*,

raised various challenges to the Department's preliminary decision to adjust normal value

according to the reported monthly rebates.  Pet'rs' Case Br. 2-36 (Jan. 27, 2011) (Admin.R.Doc.

No. 91).  Koehler submitted a rebuttal brief responding to Koehler's comments.  Koehler's

Rebuttal Br. 4-37 (Feb. 4, 2011) (Admin.R.Doc. No. 96).  In the Final Results, issued on

April 20, 2011, Commerce continued to adjust normal value for Koehler's reported quarterly and

annual rebates but excluded the reported monthly rebates from the normal value calculation and

assigned Koehler a 3.77% weighted average antidumping duty margin.[6]  *Final Results*,

---

    [5] Initially, Appvion also requested the review of a second producer/exporter, Mitsubishi
HiTec Paper Flensburg GmbH, Mitsubishi HiTec Paper Bielefeld GmbH, and Mitsubishi
International Corporation (collectively "Mitsubishi"), but Appvion withdrew this request.
*Lightweight Thermal Paper From Germany: Notice of Prelim. Results of Antidumping Duty
Admin. Review*, 75 Fed. Reg. 77,831, 77,832 (Dec. 14, 2010).

    [6] On April 25, 2011, Koehler submitted comments in which it alleged, under 19 C.F.R.
(continued . . .)

76 Fed. Reg. at 22,079; Issues & Decision Mem., A-428-840, ARP 10-09, at 21 (Apr. 13, 2011)

(Admin.R.Doc. No. 109, *available at*

http://enforcement.trade.gov/frn/summary/GERMANY/2011-9574-1.pdf (last visited

Mar. 18, 2014) ("*Decision Mem.*").

   Plaintiff filed a summons on May 13, 2011 and a complaint on June 3, 2011.

Summons 1, ECF No. 1; Compl. 1.  With leave of the court, Order (May 20, 2013), ECF No. 82,

plaintiff filed an amended complaint on May, 20, 2013,[7] Am. Compl. 1.  Plaintiff moved for

judgment on the agency record on November 15, 2011, and defendant and defendant-intervenor

each filed a brief in opposition on March 6, 2012 and March 7, 2012, respectively.

Pls.' 56.2 Mot. 1; Br. in Supp. of Pls.' Mot. for J. on the Agency R. Under Rule 56.2 at 1

(Nov. 16, 2011), ECF No. 27 ("Pls.' 56.2 Mem."); Def.'s Opp'n 1; Def.-intervenor's Opp'n 1.

Plaintiff filed its reply to defendant and defendant-intervenor, Pls.' Reply Br., ECF No. 51

---

                                                          (. . . continued)
§ 351.224, that the U.S. Department of Commerce ("Commerce" or the "Department") had made
a ministerial error by "disallowing not only those rebates that were applied retroactively for sales
made *prior* to written notice of the actual rebate amount, but also by disallowing rebates for sales
that were made *subsequent* to written notice to the customer of the actual rebate amount and *ipso
facto*, could not be 'retroactive.'"  *Koehler's Letter Alleging Ministerial Error* 1(Admin.R.Doc.
No. 115) (emphasis in original).  Commerce denied Koehler's request to correct a ministerial
error, clarifying that it intended to exclude the monthly rebates per certain factual findings in the
Final Results.  *Allegation of Ministerial Errors* 4-5 (May 10, 2011) (Admin.R.Doc. No. 120)

   [7] Plaintiff's original complaint included a third claim challenging the Department's use of
"zeroing" methodology in the first administrative review.  Compl. ¶¶ 26-30 (June 3, 2011),
ECF No. 6.  On December 10, 2012, the court ordered this action stayed pending the final
resolution of all appellate proceedings in *Union Steel v. United States*, CAFC Court
No. 2012-1248, which raised a challenge similar to plaintiff's zeroing challenge.  Order,
ECF No. 71.  The stay expired when the decision of the Court of Appeals for the Federal Circuit
("Court of Appeals"), which affirmed the Department's use of the zeroing methodology in an
administrative review, became final.  *See Union Steel v. United States*, 713 F.3d 1101, 1010-11
(Fed. Cir. 2013).  Plaintiff, with leave of the court, Order (May 20, 2013), ECF No. 82, deleted
the zeroing claim from the amended complaint, Am. Compl. ¶5.

(Apr. 23, 2012) ("Pls.' Reply Br."), and requested oral argument, Pls.' Unopposed Mot. for Oral

Arg. & Req. for a Closed Hearing, (Apr. 27, 2012), ECF No. 55, which the court held on

October 18, 2012, ECF No. 63.[8]

At the oral argument, plaintiff requested leave to file additional briefing related to

*Christopher v. SmithKline Beecham Corp.*, 567 U.S. __, 132 S.Ct. 2156 (2012), a decision the

U.S. Supreme Court issued after the parties filed all briefs in this action.  Oral Tr. 143-47.

Plaintiff argued that the decision could have a bearing on the outcome of this action if the court

determines that the Department's regulations at issue in this matter are ambiguous.  Oral

Tr. 144-45.  The court, upon the agreement of all parties, permitted supplemental briefing on this

limited issue.  Order, (Sept. 10, 2013), ECF No. 87.  *See also* Def.-Intervenor's Supplemental Br.

(Oct. 11, 2013), ECF No. 92 ("Def.-intervenor's Supplemental Br."); Def.'s Supplemental Br.

Regarding Deference Accorded to Commerce's Interpretation of its Own Regulations

(Nov. 18, 2013), ECF No. 100 ("Def.'s Supplemental Br."); Pl.'s Response to Supplemental Brs.

(Dec. 9, 2013), ECF No. 101 ("Pl.'s Supplemental Br.").

## II. DISCUSSION

The court exercises jurisdiction under section 201 of the Customs Courts Act of 1980,

28 U.S.C. § 1581(c), pursuant to which the court reviews actions commenced under

section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a, including an action

contesting the final results of an administrative review that Commerce issues under section 751

---

[8] At oral argument, defendant-intervenor withdrew a Motion to Supplement the Administrative Record, which both plaintiff and defendant opposed.  In that motion, Appvion sought to place on the record certain information concerning a subsequent administrative review. Oral Tr. 119.

of the Tariff Act, 19 U.S.C. § 1675(a).[9]  When reviewing the final results of an administrative

review, the court "shall hold unlawful any determination, finding, or conclusion found . . . to be

unsupported by substantial evidence on the record, or otherwise not in accordance with law. . . ."

19 U.S.C. § 1516a(b)(1)(B)(i).

Commerce determines an antidumping duty margin by comparing the normal value of the

subject merchandise to the export price (or constructed export price) at which the subject

merchandise is sold in the United States.  19 U.S.C. § 1673.  When Commerce determines

normal value based on the price at which the foreign like product is sold in the home market,

Commerce must use as its starting price "the price at which the foreign like product is first

sold . . . for consumption in the exporting country, in the usual quantities and in the ordinary

course of trade . . . ," *id.* § 1677b(a)(1)(B)(i), and then make certain statutorily-required

adjustments, *id.* § 1677b(a)(6), (7).  The Department's regulations provide for further

adjustments.  In pertinent part, the Department's regulation, 19 C.F.R. § 351.401(c), provides as

follows:

> *Use of price net of price adjustments.*  In calculating export price, constructed
> export price, and normal value (where normal value is based on price), the
> Secretary will use a price that is net of any price adjustment, as defined in
> § 351.102(b), that is reasonably attributable to the subject merchandise or the
> foreign like product (whichever is applicable).

19 C.F.R. § 351.401(c).  "'Price adjustment' means any change in the price charged for subject

merchandise or the foreign like product, such as discounts, rebates and post-sale price

adjustments, that are [*sic*] reflected in the purchaser's net outlay."  19 C.F.R. § 351.102(b)(38).

---

[9] All statutory citations herein are to the 2006 edition of the United States Code and all
citations to regulations are to the 2010 edition of the Code of Federal Regulations.

At issue in this case are rebates made to Koehler's home market customers according to a "monatsbonus" *i.e.*, monthly rebate, program.  Plaintiff claims that Commerce violated 19 C.F.R. § 351.401(c) when it failed to make corresponding downward adjustments in the starting prices Commerce used in determining normal value, *i.e.*, the prices at which Koehler sold the foreign like product in its home market.  Pls.' 56.2 Mem. 11-12.  According to plaintiff, Commerce acted contrary to the plain meaning of the pertinent regulations, wrongfully applied its concept of what is a "legitimate" rebate, and imposed an unauthorized "test of what the customer does or does not know about the amount of the rebate at the time of the sale."  Pls.' Reply Br. 1.  For the reasons discussed below, the court finds merit in plaintiff's claim and will order an appropriate remand.

In the Preliminary Results, Commerce stated that "Koehler reports customer-specific rebates which may apply to all products or be product-specific" and reached a finding that "Koehler paid rebates on a periodic basis (either monthly, quarterly, or annually)."  *Prelim. Results*, 75 Fed. Reg. at 77,835.  Addressing an allegation by the petitioner (Appvion) that "Koehler has applied a pricing scheme using post-sale adjustments" and that "these are not bona fide rebate adjustments where the customer knows the rebate amount at the time of sale," *id.*, Commerce stated that "based on the evidence on the record of this review, we preliminarily find Koehler's rebates to be bona fide, and we will allow the rebates as reported in Koehler's sales databases," *id.* at 77,836.

In the Final Results, Commerce reversed its position with respect to the monthly (but not the quarterly or annual) rebates Koehler reported, concluding that "the record does not demonstrate that the monatsbonus is a legitimate rebate that should be treated as a price adjustment for this review." *Decision Mem.* 15.  Commerce based this conclusion on findings

that it summarized by stating that certain "2002/03 written rebate documentation" on the record

"does not specifically apply to the monatsbonus," that "the monatsbonus is unique because it

differs significantly from Koehler's other rebates," and that "Koehler failed to demonstrate that

its customer was aware of the terms and conditions of the monatsbonus prior to the sales." *Id.*

At no point during the administrative review did Commerce find that the monthly rebates

reported by Koehler were not actually paid to the home market customers.  The Issues and

Decision Memorandum ("Decision Memorandum") incorporated into the Final Results raises no

question as to whether the monthly rebates were "reflected in the purchaser's net outlay,"

19 C.F.R. § 351.102(b)(38), or whether the monthly rebates were "reasonably attributable" to

sales of the "foreign like product" within the meaning of 19 C.F.R. § 351.401(c).  *See Decision*

*Mem.* 21-22.  Commerce expressly found in the Preliminary Results that Koehler made the

rebates at issue, and nothing in the Final Results or Decision Memorandum reversed that finding.

*Prelim. Results*, 75 Fed. Reg. at 77,835.  To the contrary, the Decision Memorandum implied

and, in some places, explicitly acknowledged that the home market customers buying the foreign

like product received the monthly rebates.  *See*, *e.g.*, *Decision Mem.* 17 ("Furthermore, due to the

frequency and significance of the changes to the monthly rebates, which are retroactively

applied, we find that Koehler has not provided sufficient support for the Department to accept

this price adjustment." (footnote omitted)); *id.* at 20 ("The monthly rebate data reported on the

record shows that there are significant adjustments to the rebate percentages which were

retroactively applied by Koehler without sufficient documentation to support a finding that the

customer was aware of such changes when the sales commenced.").  The Decision Memorandum

discusses the "monatsbonus" issue in the context of rebates that Koehler made to customers

buying the foreign like product but that Commerce refused to recognize as price adjustments.

In the situation presented by this case, Commerce lacked the discretion not to recognize a reduction in the purchaser's net outlay for the foreign like product that satisfied the definition of a "price adjustment" in § 351.102(b)(38).  19 C.F.R. § 351.401(c) ("In calculating . . . normal value (where normal value is based on price), the Secretary *will use* a price that is net of *any* price adjustment, as defined in § 351.102(b) . . . ." (emphasis added)).  As plaintiff notes, "[t]he term 'will' is of an 'unmistakably mandatory character.'"  Pl.'s Supplemental Br. 3 (citing *Hewitt v. Helms*, 459 U.S. 460, 471 (1983)).  Giving as examples "discounts, *rebates*, and *post-sale price adjustments*," the regulations set forth a broad definition of price adjustment encompassing "*any* change in the price charged for . . . the foreign like product" that "are reflected in the purchaser's net outlay."[10]  19 C.F.R. § 351.102(b)(38) (emphasis added).  Here, § 351.401(c) did not permit Commerce to use a home market price for the foreign like product that was *not* net of any price adjustment satisfying the § 351.102(b)(38) definition.  The Decision Memorandum reaches the opposite conclusion by relying on irrelevant findings and on erroneous reasoning.

Among the Department's irrelevant findings is that "Koehler has not provided sufficient evidence on the record of its monthly rebate program."  *Decision Mem.* 19.  Similarly, Commerce found that "Koehler has not provided documentation specifically describing the monatsbonus and the terms and conditions of the monatsbonus (as opposed to longer-term rebates), as reported in this review."  *Id*.  Both of these findings are directed to the wrong question.  Under the regulations, the question is not whether the rebates were made according to

---

[10] The word "are" that appears in 19 C.F.R. § 351.102(b)(38) possibly should read "is" so as to agree with the singular term "change."  Alternatively, it might be possible to read "are reflected" to apply only to the examples listed, but this is a strained reading that is at variance with the intended meaning as shown in the regulatory history, which is discussed herein.

a "program" that satisfied the various prerequisites Commerce identified in the Decision

Memorandum but whether the monthly rebates actually were made, *i.e.*, whether there were

downward adjustments in the prices charged for the foreign like product that were reflected in

purchasers' net outlays.

Commerce also found that "Koehler has not demonstrated that its customers had prior

knowledge of the rebate program." *Id.*  Commerce further found that "Koehler has not provided

sufficient evidence on the record to demonstrate that the monthly rebate program was in

existence before the sales were made" and "has acknowledged that its customer(s) may not be

aware of the precise amount of the rebate prior to a particular sale." *Id.* at 20.  Here also, these

findings are directed to matters other than whether there was "any change in the price charged

for . . . the foreign like product" that was "reflected in the purchaser's net outlay."  19 C.F.R.

§ 351.102(b)(38).

In reaching conclusions from its findings, the Department's reasoning is erroneous in

several respects.  Beginning with the premise that the "standard for determining the legitimacy of

a price adjustment is codified in the regulations, outlined in the Department's antidumping duty

questionnaire, and reflected in the Department's prior practice," *Decision Mem.* 15, the Decision

Memorandum misinterprets the applicable regulations and misconstrues the discussion of these

regulations in the preamble that accompanied promulgation ("Preamble").  *See Antidumping

Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,344 (May 19, 1997) ("*Final Rule*").  But

neither the regulations nor the Preamble supports a regulatory interpretation under which

Commerce was free to disregard the rebates at issue in this case.  The Decision Memorandum

then grounds the Department's decision in a passage from the questionnaire and a practice of the

Department regarding rebates, both of which are inconsistent with the regulations.

The Decision Memorandum misapplies the regulations in declining to adjust the home

market prices for the monthly rebates.  As discussed above, Commerce did not conclude from its

various findings that the monthly rebates were not "reflected in the purchaser's net outlay"

within the meaning of § 351.102(b)(38) or not "reasonably attributable to the . . . foreign like

product" within the meaning of § 351.401(c).  In addition, as the court has pointed out, the

Decision Memorandum is written from the viewpoint that the monthly rebates were in fact paid

to home market customers of the foreign like product.  In the circumstances presented by the

Department's own findings, the regulations do not merely "allow," but require, Commerce to

treat these rebates as post-sale price adjustments.  Although § 351.401(b) provides that "[t]he

interested party that is in possession of the relevant information has the burden of establishing to

the satisfaction of the Secretary the amount and nature of a particular adjustment," Commerce

was not empowered by this general provision, which applies to all adjustments (including

expenses), not merely price adjustments, to ignore the specific standard established by

§ 351.401(c) according to which the Secretary must recognize a "price adjustment" as defined in

§ 351.102(b)(38).

The Decision Memorandum also mistakenly relies on the Preamble to support the

Department's decision.  When read in context, the pertinent discussion in the Preamble reveals

that the Department's intent in promulgating the final rule was that reductions in the price of the

foreign like product, such as those at issue in this case, must be reflected in the starting price

used to determine normal value.

The Preamble explained that the new § 351.401(c), in the form published in the proposed

rule, "restated the Department's practice with respect to price adjustments, such as discounts and

rebates."[11] *Final Rule*, 62 Fed. Reg. at 27,344. In proposing the new section, Commerce

described "the Department's practice" as follows: "Under paragraph (c), the Department will

continue its practice of adjusting reported gross prices for discounts, rebates and certain post-sale

adjustments to price that affect the net price." *Antidumping Duties; Countervailing Duties*,

61 Fed. Reg 7,308, 7,329 (Feb. 27, 1996) (notice of proposed rulemaking).

The Preamble further explained that Commerce took "several steps aimed at alleviating"

confusion concerning the proposed § 351.401(c) and price adjustments generally that Commerce

believed was reflected in the comments to the proposed rule. *Final Rule*, 62 Fed. Reg. at 27,344.

The Preamble explained that the Department included in the promulgated § 351.102 a new

definition of the term "price adjustment." *Id.* Concerning the term "price adjustment" and the

definition inserted in § 351.102(b), the Preamble adds that "[t]his term is intended to describe a

category of changes to a price, such as discounts, rebates and post-sale price adjustments, that

affect the net outlay of funds by the purchaser" and that "such price changes are not 'expenses'

as the Department usually uses that term, but rather are changes that the Department *must take

into account in identifying the actual starting price*." *Id.* at 27,300 (emphasis added). The

Preamble also noted that "price adjustments are neither direct nor indirect expenses, although

they impact price as additions or deductions." *Id.*

The Preamble elaborated that "we have made a clarification in [§ 401(c)] itself," adding

that the paragraph "now provides that in calculating export price, constructed export price, or a

---

[11] The proposed § 401(c) read as follows: "(c) *Discounts, rebates and other price adjustments.* In calculating export price, constructed export price, and normal value (where normal value is based on price), the Secretary will rely upon a price net of any discounts, rebates, or post-sale adjustments to price that are reasonably attributable to the subject merchandise or the foreign like product (whichever is applicable)." *Antidumping Duties; Countervailing Duties*, 61 Fed. Reg 7,308, 7,381 (Feb. 27, 1996) (notice of proposed rulemaking)

price-based normal value, the Secretary will use a price that is net of any price adjustment that is

reasonably attributable to the subject merchandise or the foreign like product." *Id.* at 27,344.

The Preamble went on to state that "[t]his use of a net price is consistent with the view that

discounts, rebates and similar price adjustments are not expenses, but instead are items taken into

account to derive the price paid by the purchaser." *Id.*  This Preamble discussion, like the

regulation itself, makes clear that Commerce intended to apply a uniform definition of "price

adjustment" when determining a starting price, regardless of whether it is the starting price for

determining normal value or for determining export price or constructed export price. *Id.*

The Decision Memorandum misconstrues the language and the intent of the Preamble in

concluding that "[w]hile the Department's regulations *allow* for post-sale price adjustments that

are reasonably attributable to the subject merchandise, the Preamble to the regulations indicates

that exporters or producers should not be allowed 'to eliminate dumping margins by providing

price adjustments 'after the fact.''" *Decision Mem.* 15 (emphasis added) (citing *Final Rule*,

62 Fed. Reg. at 27,344).  The passage in the Preamble from which the Decision Memorandum

drew this conclusion reads as follows:

> One commenter suggested that, at least for purposes of normal value, the
> regulations should clarify that the only rebates Commerce will consider are ones
> that were contemplated at the time of sale.  This commenter argued that foreign
> producers should not be allowed to eliminate dumping margins by providing
> ''rebates'' only after the existence of margins becomes apparent.
> The Department has not adopted this suggestion at this time.  We do not
> disagree with the proposition that exporters or producers will not be allowed to
> eliminate dumping margins by providing price adjustments ''after the fact.''
> However, as discussed above, the Department's treatment of price adjustments in
> general has been the subject of considerable confusion.  In resolving this
> confusion, we intend to proceed cautiously and incrementally.  The regulatory
> revisions contained in these final rules constitute a first step at clarifying our
> treatment of price adjustments.  We will consider adding other regulatory
> refinements at a later date.

*Final Rule*, 62 Fed. Reg. at 27,344.  Commerce has not amended the text of § 351.401(c) or

§ 351.102(b)(38) since promulgating the final rule in 1997.[12]  When read in the entirety and in

conjunction with the plain language of the regulations, the Preamble refutes rather than supports

the reasoning by which Commerce decided to disregard Koehler's monthly rebates.[13]

Regarding the questionnaire, the Decision Memorandum mentions that "[a]s stated in the

Department's initial questionnaire issued to Koehler, '{w}hen the seller establishes the terms and

conditions under which the rebate will be granted at or before the time of sale, the Department

reduces the gross selling price by the amount of the rebate.  (Section 351.102(b) of the

regulations).'"  *Decision Mem.* 15-16 (footnote omitted).  The provision the questionnaire cited,

19 C.F.R. § 351.102(b), sets forth in paragraph (38) a definition of "price adjustment" that does

not require the seller's having established the rebate terms and conditions at or before the time of

sale, and the Preamble clarifies that Commerce, in promulgating the regulations, rejected the

position taken in the questionnaire.  In attempting to impose the very requirement Commerce

rejected in promulgating the regulations, the questionnaire misapplies § 351.102(b)(38) and its

related provision, § 351.401(c).

---

[12] A subsequent, non-substantive amendment assigned the regulatory definition of "price adjustment" its current designation, 19 C.F.R. § 102(b)(38).  *Antidumping & Countervailing Duty Proceedings: Documents Submission Procedures; APO Procedures*, 73 Fed. Reg. 3,640, 3,642 (Jan. 22, 2008).

[13] The court finds no conflict between the regulations, 19 C.F.R. § 351.102(b)(38) and § 351.401(c), and the preamble accompanying promulgation, when properly construed.  Were there a conflict, the regulation normally would prevail.  Where plain language of a regulation unambiguously resolves a question, resort to regulatory history ordinarily should not be made to support a contrary understanding.  *See Roberto v. Dep't of the Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) ("Because the plain meaning of the regulation is clear, no further inquiry is required into agency interpretations or the regulatory history to determine its meaning.").

As to "prior practice," the Decision Memorandum states that "the Department's practice has been to disallow rebates where the respondent cannot demonstrate that the customer was aware of the terms and conditions of the rebate at or before the time of sale." *Decision Mem.* 20 (footnote omitted).  The Decision Memorandum explains that respondents are required "'to prove that the buyer was aware of the conditions to be fulfilled and the approximate amount of the rebates at the time of the sale'" in order "'to protect against manipulation of the dumping margins . . . .'" *Id.* at 18 (citing *Certain Corrosion-Resistant Carbon Steel Flat Products & Certain Cut-to-Length Steel Plate from Canada*, 61 Fed. Reg. 13,815, 13,823 (Mar. 28, 1996)). Applying its described practice, the Decision Memorandum places on Koehler the burden of showing entitlement to a price adjustment "by demonstrating that (1) its customers were aware of the terms and conditions of the monatsbonus at the time of sale, and (2) the monatsbonus was established in the ordinary course of business solely for 'legitimate commercial purposes.'" *Id.* at 20.  The practice variously described in the Decision Memorandum imposes requirements unsustainable under the governing regulations, 19 C.F.R. § 351.401(c) and § 351.102(b)(38).

Before the court, defendant and defendant-intervenor make a number of arguments in support of the Department's exclusion of the monthly rebates, most of which parallel the erroneous reasoning of the Decision Memorandum.  While acknowledging that Commerce rejected a request that the regulations allow only rebates contemplated at the time of sale, defendant argues that "Commerce's practice was, and still is, to require that a company's customers had knowledge of the terms and conditions of a claimed rebate at or before the time of sale."  Def.'s Opp'n 16.  Defendant submits that this practice "long pre-exists the regulation," Oral. Tr. 34, and that the continuation of this practice before and after Commerce promulgated this regulation "indicates that when Commerce was promulgating this reg[ulation] it understood

the reg[ulation] to incorporate its practice." Oral Tr. 53. According to defendant, Commerce

"essentially promulgated this regulation in order to restate the Department's practice" and to

maintain the status quo. Oral. Tr. 34. Defendant's conception of the history of the regulatory

provisions in question is contradicted by the discussion in the Preamble, which described as

"new" the definition of the term "price adjustment" that was added in the final rule. *Final Rule*,

62 Fed. Reg. at 27,346. Certain discussion in the Preamble refers to an intent to restate a

practice, but the reference is to the proposed § 401(c), not the final version promulgated, and the

practice discussed therein is not as characterized by defendant's argument. *See id.* at 27,344.

Nowhere in the Preamble does Commerce express the intent to codify a practice such as

defendant describes.

 In an attempt to bolster its argument, defendant cites two decisions of this Court,

*Nachi-Fujikoshi Corp. v. United States*, 19 CIT 914, 890 F. Supp. 1106 (1995) and *Koenig &*

*Bauer-Albert AG v. United States*, 22 CIT 574, 15 F. Supp. 2d. 834 (1998), *aff'd in part*, *vacated*

*on other grounds*, 259 F.3d 1341 (Fed. Cir. 2001). Def.'s Opp'n 11-12. Both of these cases

arose from administrative determinations made prior to the June 18, 1997 effective date of the

final rule that instituted § 351.401(c) and § 351.102(b)(38). *Final Rule*, 62 Fed. Reg. at 27,296.

 Defendant-intervenor argues that according to the definition in 19 C.F.R.

§ 351.102(b)(38), which provides that a price adjustment must constitute a change in the price

"charged for" the foreign like product, a retrospective rebate cannot be considered a qualified

price adjustment because it does not reflect the actual price charged. Def.-intervenor's

Supplemental Br. 7-8.[14] This argument misreads the plain language of § 351.102(b)(38), which

---

[14] Defendant-intervenor also advances arguments that Koehler failed to exhaust its
administrative remedies in pursuing its claim concerning rebates. Defendant-intervenor submits
(continued . . .)

explicitly provides that "post-sale price adjustments" fall within the definition so long as they

"are reflected in the purchaser's net outlay," 19 C.F.R. § 351.102(b)(38), and cannot be

reconciled with the regulatory history set forth in the Preamble.

Finally, defendant and defendant-intervenor make various arguments under which they

advocate that the court, under Supreme Court precedent, including *Auer v. Robbins*,

519 U.S. 452 (1997), must give deference to the Department's construction of the applicable

regulations and therefore must affirm the decision not to recognize the price adjustments at issue

in this litigation.  Def.'s Suppl. Br. 5-6; Def.-Intervenor's Suppl. Br. 3-4.  Defendant argues that

the regulations do not define the term "rebate" and that Commerce therefore is entitled to fill this

gap.  Def.'s Suppl. Br. 5-6.  Defendant-intervenor characterizes the applicable regulations as

ambiguous.  Def.-Intervenor's Suppl. Br. 3-4.   These arguments fail because the regulatory

interpretation adopted in the Decision Memorandum is unreasonable.  For the reasons the court

has discussed, this interpretation is contrary to both the plain meaning and the Department's

intent as revealed in the regulatory history.  The court is unable to agree that that the regulatory

---

(. . . continued)
that Koehler did not include in its rebuttal brief the specific argument that the Department's
regulation requires all price adjustments to normal value, including post-sale rebates, "no matter
how spurious."  Resp. in Opp'n to Pls.' Rule 56.2 Mot. for J. on the Agency R. 6 (Mar. 7, 2012),
ECF No. 42.  *See also* Oral Tr. 57-60.  According to defendant-intervenor, this failure deprived
Commerce of a "full and fair opportunity to articulate a construction of the regulation and make
whatever factual findings are necessary to address Koehler's arguments as reframed on appeal."
Def.-intervenor's Supplemental Br. 10-11.  The court rejects this argument because Koehler,
during the administrative review, opposed the position taken by defendant-intervenor on the
rebates at issue in this case and specifically discussed the effect of the regulations.  Koehler's
Rebuttal Br. 28-31 (Feb. 4, 2011) (Admin.R.Doc. No. 96).  During the review, Koehler could not
have opposed the Department's construction of the regulations, which did not appear until the
Department issued the Final Results.  Moreover, even were the court to have found a failure to
exhaust, that failure might have been excused because the issue presented involves construction
of the regulations, a pure question of law.  *See Agro Dutch Indus. Ltd. v. United States,*
508 F.3d 1024, 1029 (Fed. Cir. 2007).

provisions in question are "ambiguous" in the sense contemplated by defendant-intervenor's argument. Defendant's "gap" argument fails because the regulatory definition of the term "price adjustment," not the absence of a definition of the term "rebate," is controlling in this case. The regulatory provisions unambiguously require that rebates and other post-sale downward adjustments in the price charged for the foreign like product that are reflected in the purchaser's net outlay be reflected in the starting price Commerce uses for determining normal value.

In summary, the court must remand the Final Results because they misapply the Department's regulations codified as 19 C.F.R. § 351.102(b)(38) and § 351.401(c). Therefore, the only issue remaining to be decided arises from plaintiff's claim that Commerce violated section 782(g) of the Tariff Act, 19 U.S.C. § 1677m(g), by denying Koehler the opportunity to comment on certain correspondence between the Secretary of Commerce and certain members of Congress concerning the first administrative review. Pls.' 56.2 Mem. 5-6; *see Memo to the File re: Correspondence from U.S. Congressmen* (Admin.R.Doc. No. 107) (Apr. 13, 2011) ("*Congressional Correspondence Memo*"). The correspondence involved in this issue is a March 30, 2011 letter to then-Commerce Secretary Gary Locke co-signed by five members of Congress ("Joint Congressional Letter") and Secretary Locke's individual responses to the letter.[15]

The Joint Congressional Letter referred to the Department's preliminary determination to "reduce the dumping margin to zero" and requested "a better understanding of the Department's

---

[15] On April 8, 2011, Secretary Locke sent each member a reply letter stating that the Department was considering whether to make adjustments for "certain reported rebates" in the Department's final determination. Letter to Rep. Michael Turner from Gary Locke (Admin.R.Doc. No. 102); Letter to Rep. Reid Ribble from Gary Locke (Admin.R.Doc. No. 103); Letter to Senator Rob Portman from Gary Locke (Admin.R.Doc. No. 104); Letter to Senator Sherrod Brown from Gary Locke (Admin.R.Doc. No. 105); Letter to Senator Herb Kohl from Gary Locke (Admin.R.Doc. No. 106).

rationale for this determination." *Congressional Correspondence Memo* 2.  The letter elaborated

that "[g]iven the importance of the Department's final determination to jobs in the U.S. paper

industry, we would specifically appreciate additional information from you regarding how after-

the-fact rebates in the German home market are being factored into your analysis and the basis

for including home market rebates issued retroactively in your calculations, including any similar

precedents." *Id.*  The letter also noted that Appvion had made major investment upgrades during

2008 and that the company's Ohio plant had created new jobs.  *Id.*

        Commerce first notified the parties to the review of the congressional correspondence on

April 13, 2010, the date on which the review was completed and the Decision Memorandum was

signed and dated.  Pls.' 56.2 Mem. 5; *Congressional Correspondence Memo* 1.  Plaintiff asks

that the court "remand with instructions to reopen the record and provide Koehler an opportunity

to comment on the March 30, 2011 letter." Pls.' 56.2 Mem. 34.  Plaintiff argues that the shift

from a *de minimis* margin in the Preliminary Results to a positive antidumping margin in the

*Final Results* and the intervening congressional correspondence together give "at least 'the

appearance of 'unlawful political suasion'" that entitles Koehler to an opportunity to comment.

Pls.' 56.2 Mem. 34 (citing *Saha Thai Steel Pipe Co., Ltd.* v. *United States,* 11 CIT 257, 261,

661 F. Supp. 1198, 1202 (1987)).  Plaintiff also asks the court to take judicial notice of two

congressional press releases issued after the Final Results.[16]

---

[16] Senator Portman and Representative Turner each issued a press release announcing the outcome in the final results of the first review and noting their joint correspondence with the Secretary of Commerce.  Senator Portman's April 22, 2011 press release mentioned that Commerce "'reversed [a] preliminary ruling that did not protect Ohio jobs in the paper industry . . . ." Am. Compl. ¶18.  Representative Turner's April 25, 2011 press release stated that Commerce had "reversed a preliminary ruling in order to protect Ohio jobs in the paper industry . . . ." Am. Compl. ¶19.

In pertinent part, section 782(g) of the Tariff Act provides as follows:

> Information that is submitted on a timely basis to the administering authority or
> the Commission during the course of a proceeding under this subtitle shall be
> subject to comment by other parties to the proceeding within such reasonable time
> as the administering authority or the Commission shall provide.  The
> administering authority and the Commission, before making a final determination
> under section 1671d, 1673d, 1675, or 1675b of this title shall cease collecting
> information and shall provide the parties with a final opportunity to comment on
> the information obtained by the administering authority or the Commission (as the
> case may be) upon which the parties have not previously had an opportunity to
> comment.

19 U.S.C. § 1677m(g).  Defendant argues that Koehler was not entitled to comment on the Joint

Congressional Letter under this provision because "the letter did not contain information relevant

to Commerce's dumping methodology or dumping calculations, meaning that it contained

nothing warranting further comment."  Def.'s Opp'n 31.  Defendant-intervenor makes the same

argument.  Def.-intervenor's Opp'n 27.  Nonetheless, citing 19 U.S.C. § 1516a(b)(2)(A)(i),

defendant explains that the Joint Congressional Letter constitutes information presented to the

Secretary during the course of the administrative proceeding and that, therefore, Commerce

properly placed the letter on the record.  Def.'s Opp'n 32.  Defendant further explains that

"[a]lthough Commerce ideally would have placed the letter upon the record earlier than April 13,

a delay of approximately two weeks is not unreasonable considering the letter's timing near the

completion of the review and the fact that it was sent directly to the Secretary."  *Id.*  Defendant

adds that "Commerce made its decision because the evidence and law supported that decision,

not because of any congressional statements."  *Id.* at 33-34.

The court need not decide whether the Joint Congressional Letter constituted "informa-

tion" requiring an opportunity for comment within the meaning of 19 U.S.C. § 1677m(g).  The

court must order a remand because the decision not to recognize as "price adjustments" the

payments made to home market customers on a monthly basis was contrary to the Department's

regulations, which are controlling on the issue presented and are binding on the court as well as

the Department.  Because Commerce must take corrective action in the determination it reaches

upon remand, plaintiff is receiving an appropriate remedy, and therefore, directing Commerce to

reopen the record to allow plaintiff to comment on the Joint Congressional Letter would serve no

purpose.  Koehler also raises the question of whether the circumstances surrounding the Joint

Congressional Letter give the appearance of "unlawful political suasion" but presses this point

only to support its argument that § 1677m(g) requires the court to order Commerce to reopen the

record so that Koehler may comment on the Joint Congressional Letter.  The court holds that the

Final Results were contrary to law because the challenged decision was in violation of the

Department's regulations, not for any reason related to the congressional correspondence.

Accordingly, the court declines to include in its remand order a directive to reopen the record of

the first administrative review.

### III.  CONCLUSION AND ORDER

The court concludes that the Department's decision not to make downward price

adjustments corresponding to the rebates that Papierfabrik August Koehler AG ("Koehler") paid

on a monthly basis to customers that purchased the foreign like product in Germany was contrary

to law because it did not comply with applicable regulations.  Therefore, upon consideration of

all papers and proceedings in this case, and upon due deliberation, it is hereby

**ORDERED** that the final determination of the International Trade Administration,
U.S. Department of Commerce ("Commerce" or the "Department") in *Lightweight Thermal
Paper From Germany: Notice of Final Results of the First Antidumping Duty Admin. Review*,
76 Fed. Reg. 22,078 (Apr. 20, 2011) be, and hereby is, set aside as unlawful and remanded for
reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall file, within ninety (90) days of the date of this Opinion
and Order, a new determination upon remand ("remand redetermination") that conforms to this
Opinion and Order and redetermines Koehler's margin as necessary; it is further

**ORDERED** that plaintiff and defendant-intervenor each may file comments on the remand redetermination within thirty (30) days from the date on which the remand redetermination is filed; and it is further

**ORDERED** that defendant may file a response to the aforementioned comments within fifteen (15) days from the date on which the last comment is filed.

/s/ Timothy C. Stanceu
Timothy C. Stanceu
Judge

Dated:  March 25, 2014
        New York, New York